**HACH ROSE SCHIRRIPA & CHEVERIE LLP**
112 Madison Avenue, 10th Floor
New York, New York 10016
212.213.8311
212.779.0028 (fax)
*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JANE DOE (C.M.), an individual,<br><br>Plaintiff,<br><br>v.<br><br>RED ROOF INNS, INC.;<br>RED ROOF FRANCHISING, LLC.;<br>FMW RRI I LLC;<br>603 FELLOWSHIP LLC<br><br><br>Defendants. | Case No.<br><br>**COMPLAINT**<br><br><br>**JURY TRIAL DEMAND** |

Plaintiff Jane Doe (C.M.) ("Plaintiff" or "Doe"), by and through the undersigned counsel, respectfully submits her complaint for damages and makes the following averments:

**INTRODUCTION**

1.     Red Roof Inns, Inc. (hereinafter "RRI"), Red Roof Franchising, LLC. (hereinafter "RRF") (collectively, RRI and RRF may be referred to as the "Hotel Brand Defendants"), FMW RRI I LLC and 603 FELLOWSHIP LLC (collectively, Defendants may be referred to as the "Hotel Defendants") know and have known that sex trafficking repeatedly occurs under their flag throughout the country. Rather than taking timely and effective measures to thwart this epidemic, the Defendants have instead chosen to ignore the open and obvious presence of sex trafficking on their properties, enjoying the profit from

1

rooms rented for this explicit and apparent purpose.

2.    Plaintiff Jane Doe, a survivor of sex trafficking, is identified by the pseudonym, and at all times relevant to this lawsuit, was a resident of Burlington County, New Jersey.

3.    In 2014, Doe met a person who groomed her into commercial sexual exploitation as a minor. This person used common methods associated with human sex trafficking such as the use of force, fraud, and coercion to manipulate Doe, controlling every aspect of her life and how Doe became a victim of a "severe form" of human trafficking as it is defined under 22 U.S.C §7102 (11).

4.    Doe's life is replete with sexual imprisonment and unimaginable abuse during which time she was forced to endure violence, trauma, brutal beatings, exploitation, manipulation, threats, isolation, humiliation, and degradation.

5.    This action for damages is brought by the Plaintiff, Jane Doe, under the Federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (hereinafter "TVPRA").

6.    Doe, a survivor of sex trafficking, brings this action for damages against Defendants pursuant to the TVPRA, 18 U.S.C. § 1595. Each Defendant knowingly benefitted from participation in a commercial business venture that they knew or should have known to be engaging in sex trafficking in violation of the TVPRA.

7.    Doe was advertised on a website well known for human trafficking against her will, physically tortured, and sexually exploited under duress at hotels in Mount Laurel, NJ.

8.    Doe's trafficker forced her onto Defendants' properties where she was repeatedly raped and forced to perform commercial sex acts with "buyers" under threats of death, physical violence, and psychological abuse.

9.    Doe has spent a considerable amount of time attempting to regain the life that was stripped away from her because of her victimization and exploitation.

10.     Doe brings this lawsuit to hold the Defendants accountable for facilitating and enabling her trafficking and profiting from it.

11.     Plaintiff brings this action pursuant to the Trafficking Victims Protection Reauthorization Act 18 U.S.C. §1595, against the Defendants who enabled, harbored, held, facilitated, or otherwise financially benefited, or any combination of the foregoing, from a sex trafficking venture in which Doe was sex trafficked, sexually exploited, and victimized in violation of the TVPRA.

## PARTIES

12.     Plaintiff Doe is a natural person and a resident and citizen of Mercer County, New Jersey. Doe is a "victim" of sex trafficking as protected under applicable provisions of the TVPRA.

13.     Defendant Red Roof Inns, Inc ("RRI"). is a publicly traded company. The company provides franchise opportunities for its hotel and motel brands through Defendant Red Roof Franchising, LLC ("RRF").

14.     Defendant RRI is a Delaware corporation, with its corporate headquarters and principal place of business located at 7815 Walton Pkwy, New Albany, Ohio 43054. RRI can be served through its registered agents, Corporation Trust Company, 1209 Orange St., Wilmington, DE 19801 and Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

15.     Defendant RRF is a Delaware limited liability company with its corporate headquarters and principal place of business located at 7815 Walton Pkwy, New Albany, Ohio 43054. RRF can be served through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

16.     Defendant FMW RRI I LLC is a Texas limited liability company with its principal address 605 S Front St, Columbus, Ohio 43215 and can be served through its registered agent, Corporation Service Company DBA CSC Lawyers Inco, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

17.     Defendant FMW RRI LLC owned the property located at 603 Fellowship Road, Mount

Laurel, New Jersey 0805, from August 25, 2011 to April 27, 2015.

18.    Defendant 603 Fellowship LLC is a Delaware limited liability company that can be served through its registered agent, Mehul Khatiwala, 561 N. Dupont Highway, Dover, Delaware, 19901.

19.    Defendant 603 Fellowship LLC owned the property located at 603 Fellowship Road, Mount Laurel, New Jersey 08054 from April 28, 2015 to the current time.

20.    RRI purchases, owns, and manages a network of hotels and motels globally, primarily in the Midwest, Southern, and Eastern United States. RRI serves customers throughout the United States and other countries throughout the World.

21.    Defendant RRI is a global hotel brand with approximately 650 branded properties worldwide. Red Roof was named one of the fastest growing franchises in 2017.

22.    RRI owns, supervises, manages, controls, and/or operates the Red Roof branded hotels where Plaintiff Doe was sex trafficked, sexually exploited, and victimized by traffickers.

23.    Red Roof Inn® owns, supervises, manages, controls, and/or operates the Red Roof Inn located at 603 Fellowship Road, Mount Laurel, NJ 0805 (hereinafter "Local RRI").

24.    Red Roof Inn® by Red Roof is a Red Roof branded property.

25.    Defendants RRI, RRF, FMW RRI I LLC, 603 Fellowship LLC are collectively referred to as the "Hotel Brand Defendants."

26.    Defendants hired employees to work at the Local RRI. Defendants' employees worked jobs including front desk staff and housekeeping.

27.    Red Roof Inn® are the principal and have control over nearly every element of operations at their branded properties, including the Local RRI. Defendants are directly and indirectly liable for the acts and/or omissions of the employees at their branded properties where Doe was trafficked. Defendants have an actual and apparent agency relationship with the property owners of the Local RRI as to establish

vicarious liability.

28.    Hotel Brand Defendants controlled and dictated the actions and inactions of the Local RRI by Red Roof through variety of means enforced through franchise agreements, brand standards, and related contracts, including but not limited to:

a.    Providing the software, hardware, and platforms where data and information is shared with Red Roof corporate;

b.    Providing reservation platforms by which payment modes and suspicious reservations would reveal patterns associated with sex trafficking;

c.    Providing or failing to provide appropriate training and education to branded hotels through webinars, seminars, conferences, and online portals;

d.    Providing and controlling customer review and response platforms;

e.    Hosting online bookings on Red Roof's domain;

f.    Requiring branded hotels to use Red Roof's customer rewards program;

g.    Requiring branded hotels to use Red Roof's property management software;

h.    Requiring branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

i.    Providing IT support for all property management systems, owned, operated, and required by Red Roof;

j.    Setting employee wages;

k.    Sharing profits;

l.    Standardizing training methods for employees;

m.    Building and maintaining the facility in a manner specified by the owner;

n.    Standardizing strict rules of operation;

o.  Regular inspections of the facility and operation by owner; and

p.  Setting room rates.

29.  Hotel Brand Defendants knowingly benefited, or received something of value, from its commercial business ventures at the Local RRI through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where Doe was trafficked, as well as in maintaining a positive public image for the Red Roof Inn brand. Red Roof also benefited from gathering personal data from the Wi-Fi it provided to customers including Doe and her trafficker.

30.  Hotel Brand Defendants are subject to the jurisdiction of this Court because Red Roof Inn® regularly conducts and transacts business in New Jersey through the operation of numerous hotels under its brand in New Jersey. Red Roof has derived substantial revenue from services rendered in New Jersey and profited from a commercial business venture that unlawfully provided safe harbor for Doe's traffickers so that she could be sold for commercial sex at the Local RRI by Red Roof.

31.  Defendants FMW RRI I LLC and 603 Fellowship LLC (hereinafter the "Hotel Defendants") were owners of the local hotel at all relevant times, and doing business as the Local RRI and agent of RRI. Hotel Defendants were involved in the staffing and operation of Local RRI, where the Plaintiff was sex trafficked. Through its relationship with the perpetrators who trafficked Doe, hotel Defendants knowingly benefited or received something of value from a venture which it knew or should have known had violated the TVPRA. Hotel Defendants owned and operated the property and managed Local RRI known as Red Roof Inn & Suites located at 603 Fellowship Road, Mount Laurel, New Jersey, 080540where Plaintiff alleges injuries related to her sex trafficking occurred.

32.  Whenever reference is made in this Complaint to any act, deed or conduct of the Defendants, the allegation is that the Defendants engaged in the act, deed, or conduct by or through one or more of

6

their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the Defendants.

## JURISDICTION AND VENUE

33.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution, laws, or treaties of the United States (with an amount in controversy that exceeds $75,000).

34.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted in this action, including the Defendants' misconduct and omissions, occurred in the judicial district where this action is brought.

35.     Sex trafficking is defined by the TVPRA under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion." This definition combines the three elements of sex trafficking as a criminal offense: the act, the means, and the purpose.

36.     While the complete definition of 'sex trafficking' is found in the TVPRA under 22U.S.C. § 7102, and it is specifically prohibited under 18 U.S.C. §1591.

37.     Pursuant to 18 U.S.C. §1591(a), all who knowingly provide or obtain commercial sex that was provided or obtained through force, fraud, and coercion are guilty of a severe form of sex trafficking. This includes, at a minimum, all the 'traffickers' who recruit, harbor, transport, and provide individuals for forced commercial sex and the 'johns' or 'buyers' who obtain, solicit, or patronize forced commercial sex.

## FACTUAL ALLEGATIONS

### The Hospitality Industry's Facilitation of Sex Trafficking

38.     Human trafficking is the world's fastest growing crime. While the term 'human trafficking'

incorporates all forced labor, the sex trafficking industry alone pulls in an estimated $99 billion each year, making it the second largest illicit crime industry behind only the sale of all illegal drugs.

39.    Sex traffickers, or 'pimps', use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

40.    The hospitality industry plays a crucial role in the sex trade. The trope of the "no-tell motel", is certainly not a new one. Hotels have long profited from their reputations as havens of privacy and discretion for sex trafficking offenders. Hotels that offer anonymity and non-traceability through cash payments and loose registration terms for use of their property, are often wrought with criminal activity generally and sex trafficking particularly. Other "high end" hotels have found ways to keep trafficking to a manageable level to allow guests anonymity for participating in sex trafficking and create a haven with unspoken terms of use for traffickers, especially how they present and deliver victims to buyers.

41.    According to National Human Trafficking Hotline statistics, hotels are the top- reported venue, where sex trafficking acts occur, even over commercial-front brothels. Traffickers and buyers alike frequently use hotel rooms to exploit victims.

42.    Traffickers use hotels as the hub of their operations. Inside the privacy afforded by hotel walls, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex. This is referred to as an "in call".

43.    Hotels are also the venue of choice for buyers seeking an "out call," wherein the buyer rents a hotel room and the trafficker delivers the victim to the buyer's room to complete the illegal and sordid transaction. Not surprisingly, buyers or "johns" typically choose to engage in trafficking sites located away from their homes, naturally leading to the increased involvement of hotels. In New York City alone, 45% of all reported sexual exploitation took place in hotels, including the Ritz Carlton and the Plaza.

44.    The sex crime epidemic is industry wide. The Polaris Project Reported an 82% increase in

victims calling the hotline in 2021 to report hotel or motel sex trafficking. In the United States, as much as 63% of all trafficking incidents happen in hotels ranging from luxury to economy.

45.    Due to the overall complacency and complicity of the hospitality industry in failing to address the issue, hotels are the venue of choice for sex trafficking. Traffickers and buyers capitalize on the hotel industry's general refusal to adopt and enforce mandatory company-wide anti-trafficking policies such as training staff on identifying and responding to human trafficking signs and victims and establishing safe and secure reporting mechanisms for those who either succumb to or witness these criminal acts.

46.    Seventy-five percent of survivors responding to a Polaris Project survey reported encountering hotels at some point during their exploitation, including repeated contact with desk and service personnel. Unfortunately, 94% also disclosed that they never received any assistance, concern, or identification from hotel staff.

47.    Every day, thousands of hotel employees witness manifestations of sex trafficking and commercial exploitation. Thus, the hospitality industry has the greatest opportunity of contact with sex trafficking victims on a person-to-person level and is in a prime position to prevent, identify and thwart sexual exploitation where it is most likely to occur.

48.    From their unique position in this epidemic, hotels, and motels with this industry- wide knowledge have the highest obligation to protect their guests from known dangers, including sex trafficking and sexual exploitation, and should be held accountable when they fail to comply. As aptly stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry…and therefore has an inherent responsibility to deter the crime and can be liable for failing to do so."

49.    Training hotel staff to identify the signs of sex trafficking is as critical and obvious a legal

obligation for the hospitality industry, as any other safety issue. The presence of sex trafficking and sexual exploitation in a hotel is frequently an obvious occurrence and, although unutilized, underutilized, or ineffectively utilized, numerous well-researched trainings and toolkits have been published to the hotel industry over the last decade to help hotel staff in every position to identify and respond to the signs.

50.     From check-in to check-out, there are several indicators that traffickers and their victims exhibit during their stay at a hotel. With proper training and the implementation of reasonable security measures, hospitality companies could prevent regular sex trafficking either at a single owned property or at multiple properties under their flag.

51.     Obvious signs of sex trafficking at a hotel may include: an excess of condoms in rooms, individuals carrying or flashing large amounts of cash, excessive amounts of cash stored in the room, renting two (2) rooms next door to each other, declining room service for several consecutive days, significant foot traffic in and out of room(s), men traveling with multiple women who appear unrelated, women known to be staying in rooms without leaving, women displaying physical injuries or signs of fear and anxiety, guests checking in with little or no luggage, hotel guests who prevent another individual from speaking for themselves, or a guest controlling another's identification documents.

52.     Hotel staff who have undergone training are more aware of sex trafficking when it happens and are more willing to report it than hotel staff who have not been trained. Thus, hotel properties adopting relaxed policies and procedures related to sex trafficking, or hotels or brands not requiring all hotel staff be trained, fall short and leave sex trafficking underreported, victims at continued and heightened risk, and traffickers in control.

53.     Hospitality companies can and should mandate that all staff working at their single property or for their brand across all hotel properties adopt practices and complete training on how to prevent, recognize and respond to sex trafficking.

54.    Hotel owners and the hospitality industry broadly have been cognizant of their role and responsibilities in the sex trafficking industry for decades.

55.    Further, nationwide campaigns recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address it. Such campaigns took initiative as early as 1997 beginning internationally with the United Nations Blue Heart Campaign, and domestically in 2010, with the U.S. Department of Homeland Security's Blue Campaign.

56.    These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry. Both campaigns released online resources and toolkits publicly accessible to any entity concerned with human trafficking.

57.    Hospitality companies have both the power and responsibility to make sex trafficking difficult for the offenders; yet, they repeatedly fail to execute their own policies. Instead, the hospitality industry continues to facilitate these crimes at their hotels, focusing on their profits rather than protecting the victims of sex trafficking.

***Hotel Brand Defendants are Major Players in the Hospitality Industry***

58.    Hotel brands or flags like Hotel Brand Defendants that own and operate the Red Roof Inn® brand lend their name and likeness to third party owners, while the building and operations are run by a franchisee or a third-party management company under the brands' control. There is a mutual benefit shared between the hotel brands and the individual hotels.

59.    The average consumer does not see this relationship. Red Roof Inn® as a parent brand gives the franchisee property its identity. It provides signage on and in front of the building that assures customers that if they check into that hotel, they can expect the standards consistent with the parent hotel brand. The same brand emblazoned on everything in the hotel from the pens in the bedside tables to the staff uniforms at the front desk.

60.     In addition to brand recognition, a marketing organization, hotel listings in the Global Distribution System (GDS) and other online travel agency databases, the brand provides the franchise hotel with access to its brand wide central reservation system, 800 number, revenue management tools, world-class loyalty programs and a website. Thus, booking and room reservations are controlled by the corporate parent brand.

61.     The franchise hotel typically pays around 10% of their total revenue back to the parent hotel brand and is required to develop and maintain the property in accordance with the parent brand's standards as they are laid out in the franchise agreement.

62.     Pursuant to the franchise agreement, the parent brand may enforce brand standards through periodic inspections that may include termination of the franchise agreement if the franchise hotel is found to be inadequate and not in compliance with the brand standards. The hotel brand, or parent, has both the right and the obligation to enforce its own standards.

63.     At the time of the incidents alleged herein, Defendant Red Roof Inn owned, operated, and controlled the Red Roof Inn® brand.

64.     Parent hotel brands may eliminate non-complying hotels from their systems, but it is at the cost and expense of losing keys, which often determine a company's value for investors, as well as terminating royalty payments and revenue that is collected from any non-compliant hotels.

***Defendants' Actual and/or Constructive Knowledge of Sex Trafficking at their Hotel***

65.     Both the Brand Hotel Defendants and the additional Hotel Defendants have been on notice of repeated incidences of sex trafficking occurring at their properties yet failed to take the necessary action to meaningfully address sex trafficking and persist in failing to take the necessary action to meaningfully address sex trafficking at their hotels.

66.     Several courts have found failure to implement policies that are sufficient to combat a

known problem in an operation can rise to the level of willful blindness or negligence.

*Defendants' Willful Blindness to Sex Trafficking at Their Hotels*

67.    Brand Hotel Defendants are aware that the hospitality industry is a major source of the human trafficking epidemic both in the U.S. and abroad. The United Nations, international non-profits, and the U.S. Department of Homeland Security, have documented this well-known epidemic of human trafficking for years and have brought particular attention to the indispensable role of hotels in the illegal operations of sex traffickers Defendants are well aware of the public outcry against human trafficking, especially when so much of the uproar surrounds the industry.

68.    For example, in 2004 End Child Prostitution and Trafficking ("ECPAT-USA") launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States, identifying the steps companies would need to take to prevent child sex trafficking. ECPAT-USA identified hotel-specific best practices for preventing sex trafficking, such as: (1) not renting by the hour; (2) not permitting cash payments; (3) monitoring online sex ads such as Craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number.

69.    Brand Hotel Defendants have access to do-not-rent ("DNR") lists at other branded properties that often list reasons for the refusal to rent, including the suspicion of human trafficking. Brand Hotel Defendants do not utilize this information across the properties they manager or operate, thereby permitting use of their hotel properties by individuals they knew or should have known were involved in sex trafficking at their properties, and failing to protect additional or continued victims, such as Doe, from repeated sex trafficking at their properties.

70.    The Defendants also have access to public police reports, news reports and internal reports generated by customers and employees, regarding sex trafficking at the Fayetteville RRI and their additional hotel locations.

71.    The Defendants have access to reviews left by guests on websites such as www.tripadvisor.com, www.yelp.com, www.google.com, and others, wherein guests frequently complain about the prevalence of obvious prostitution, hearing physical violence by pimps, and other signs of human trafficking across various hotel locations, including the hotel where Doe was sex trafficked.

72.    A brief examination of just a handful of examples for each Hotel Defendant suffices to show the extraordinary frequency with which the Defendants have long received and continue receiving evidence and reports that human trafficking runs rampant at the hotel location where Doe was sex trafficked:

**The Hooker Hilton**

Review of **Red Roof Inn Mt Laurel**

●○○○○  Reviewed Feb 5, 2007

This place is a horrible hotel. First, I check in, drop off my luggage, and go get something to eat. I come back to find my room wide open, so I go to the front desk to report it, where i get the "Well, maybe you didnt close the door" and "I'm the only one here, so". The next night, a local prostitute moved in next door and started peddling her wares, so there was traffic all night, and even worse, she was a screamer. So I go to the front desk to report this, where I find the attendant asleep. Don't waste your money here. Go to the REsidence Inn in Cherry Hill

**Show less**

Date of stay: February 2007                                                          1

*The Sex Trafficking of Jane Doe*

73.    Plaintiff Jane Doe's life was devalued and otherwise adversely affected by each Defendant's

---

1    CommandoBob, The Hooker Hilton, Tripadvisor.com (Feb. 5, 2007), https://www.tripadvisor.com/ShowUserReviews-g46649-d223813-r6751521-Red_Roof_Inn_Mt_Laurel-Mount_Laurel_New_Jersey.html. Said review was posted by a patron who, in a mere fleeting visit to the Red Roof Inn, readily observed unmistakable signs of "prostitution." If a transient guest could so swiftly discern the illicit activities permeating the premises, it defies reason to suggest that hotel staff, with their prolonged presence and daily oversight, remained oblivious to the blatant trafficking unfolding under their noses over months.

individual and combined inattention to the realities of sex trafficking. Each Defendant chose to maintain policies and procedures, ignoring and maintaining practices that permitted Doe to be sex trafficked repeatedly. Doe was thereby subject to continued threats of violence, unwanted drugging, beating and sexual assaults by traffickers and buyers who maintained control over Doe.

74.    In May 2014, Plaintiff, then a 17-year-old minor, was grieving her mother's recent death and facing homelessness, rendering her particularly vulnerable.

75.    During this period, Plaintiff met Defendant Stanton Krogulski ("Krogulski"), also known as "S," a white male, while walking to a store near the Red Roof Inn located at 603 Fellowship Road, Mount Laurel, NJ 08054.

76.    Krogulski initially presented himself as friendly, offering companionship, but within days began grooming and manipulating Plaintiff, coercing her into sex trafficking from May 2014 (starting when she was seventeen years old) until her escape in late August 2015.

77.    Initially, Krogulski provided Plaintiff with money to foster dependency, exploiting her homelessness, and when she resisted, he became violent, hitting and dragging her, and on one occasion raped her after she refused to comply.

78.    Krogulski used physical violence, verbal abuse, threats, and drugs, including ecstasy, which Plaintiff had never used prior to meeting him, to force her compliance.

79.    Krogulski threatened to "blow [her] fucking head off" if she spoke out or attempted to leave, a threat Plaintiff believed due to his possession of firearms.

80.    Krogulski constantly monitored Plaintiff, never allowing her out of his sight, until she managed to escape in late August 2015.

81.    Plaintiff was trafficked approximately 30-50 times at the Red Roof Inn, forced to engage in sexual acts with two to three men daily, sometimes back-to-back, with men waiting outside the room or

in cars.

82.    Krogulski checked into the Red Roof Inn himself or used other women he trafficked, to reserve rooms, as Plaintiff was a minor during the first few weeks of trafficking and, as a result, did not register.

83.    Plaintiff, visibly a teenager, was required to pass the front desk to access rooms, and it was evident to Red Roof Inn staff that Krogulski, an aggressive white male, was trafficking women, as he frequently reserved rooms and was seen with multiple half-dressed Black women who appeared battered, scared, or submissive.

84.    Plaintiff witnessed Krogulski physically assault another female victim being trafficked, and both were forced to perform sexual acts in the same room with multiple men.

85.    In 2015, another unknown trafficked woman ran half-naked into the Red Roof Inn parking lot, yelling for help, and escaped without pursuit by Krogulski. Yet, Plaintiff continued to be trafficked at this location by Krogulski.

86.    Red Roof Inn staff witnessed overt signs of trafficking, including Krogulski's verbal abuse, such as telling Plaintiff, "Bitch, fix your face before I fix it for you," in their presence, yet took no action.

87.    Additional red flags observed by Red Roof Inn staff included frequent room changes, cash payments for extended stays, large quantities of condoms in rooms, and multiple men visiting the same rooms daily, occurring in a specific wing of the hotel, suggesting staff had actual or constructive notice of the trafficking.

88.    Upon information and belief, Red Roof Inn financially benefited from and participated in Plaintiff's trafficking, as public online reviews from before and after the period of Plaintiff's trafficking describe "prostitution" at this location, indicating an ongoing issue.

89.    Red Roof Inn employees' inaction, despite clear evidence of trafficking, demonstrates

acquiescence to these activities.

90. As a result of her trafficking, Plaintiff has endured profound and lasting trauma, experiencing symptoms consistent with post-traumatic stress disorder, including fear, anxiety, depression, and isolation, which are expected to persist lifelong.

91. Plaintiff distrusts others, particularly men, and is triggered by sexual acts, preventing her from maintaining intimate relationships or enjoying physical intimacy, disrupting her interpersonal relationships and overall quality of life.

92. Plaintiff never completed high school, obtaining a GED instead, and felt too "tarnished" to pursue further education due to the trauma from her trafficking.

93. During the time she was trafficked, Doe's trafficker(s) constantly shuffled her back and forth among hotels, often visiting the same hotels repeatedly.

94. While at the Defendants' hotels, Doe's traffickers violently attacked and beat her, and psychologically tormented her by threatening to kill her, and waiting outside of the hotel while Doe was forced to meet with buyers, all to ensure that she could not escape.

95. During her captivity at Defendants' hotels, Defendants accepted cash payments from traffickers for rooms where Doe was sexually assaulted, continuously abused physically and verbally, psychologically tormented, kidnapped, and held against her will in Defendants' hotel location listed above. The traffickers kept Doe on illicit drugs at regular intervals to create a physical addiction, this was one of their methods of coercing Doe into being compliant while being sex trafficked.

96. Every time Doe interacted with Defendants' staff, it was readily apparent that Doe was not at their property under her own volition, but instead was under the control of often brutal traffickers.

97. The traffickers of Doe followed a repetitive and routine procedure during stays at the Defendants' hotels outlined below. The repetitive and routine procedures indicate that Defendants

knowingly benefited from what they knew or should have known was the sex trafficking of Doe at their properties and in their rented hotel rooms.

***The Defendants Facilitated the Trafficking of Doe***

98.  Defendant Red Roof Inn is a signatory of the ECPAT Code and thereby have promised to adopt policies to prevent and combat trafficking. Despite their promises, Red Roof Defendants have failed to implement most, if not all these policies.

99.  Defendants benefit from sex trafficking and have benefited specifically from the sex trafficking venture that entrapped Doe. Red Roof Defendants knowingly or negligently aided her traffickers. The Defendants provided rooms to Doe's traffickers, when they knew, or should have known, that Doe's traffickers were using their hotel rooms to force Doe into commercial sex acts, physically threaten her, drug her and subject her to repeated sexual exploitation as they maintained her in sexual servitude.

100.  Defendants knew, or should have known, that Doe was being trafficked and that Defendants were knowingly benefiting financially from said activity, because Doe's traffickers frequented the Defendants' hotels and had multiple victims who were trafficked, coerced, drugged and threatened at this location.

101.  Defendants knew, or should have known, that Doe was being trafficked because Krogulski had daily quotas and would have victims and buyers frequenting his room and the hotel property. Further, the trafficker engaged in suspicious behavior that indicated he used the Defendants' hotel rooms for trafficking activities.

102.  Defendants knowingly benefited, while willingly or negligently turning a blind eye to providing lodging to Doe's traffickers for the purposes of harboring and maintaining Doe while she was being sex trafficked.

103.   Defendants profited from the sex trafficking of Doe and knowingly or negligently aided Doe's traffickers in their sex trafficking scheme. The Defendants took no action as Doe was trafficked at this hotel with different male guests who arrived without any luggage.

104.   Defendants benefited from the trafficking of Doe by knowingly or negligently maintaining lodging and providing cover to those who purchased sex from Doe while she was being trafficked.

105.   Defendants had the opportunity to stop Doe's traffickers and offenders like them from victimizing Doe and others like her. Instead, the Defendants failed to take reasonable measures to stop the sex trafficking occurring from and within its property.

106.   Defendants financially benefited from the sex trafficking of Doe, and other victims like her, and developed and maintained business models that attracted and fostered the commercial sex market for traffickers and buyers alike.

107.   Defendant Red Roof Inn enjoys a steady stream of income that sex traffickers bring to their budget level hotel brands, such as Red Roof Inn® by Red Roof.

108.   Red Roof Defendants financially benefit from their ongoing reputation for privacy, discretion, and the facilitation of commercial sex.

109.   Despite such obvious indicators of illegal activity and sex trafficking, Red Roof Defendants failed to take any steps to alert the authorities, properly intervene, or take reasonable security steps to improve awareness of sex trafficking and/or prevent sex trafficking on their properties.

110.   Defendant Red Roof Inn maintained brand deficiencies to maximize profits by:

    a.   Opening and operating in locations known for sex trafficking to maximize the number of hotel rooms under their brand flag.

    b.   Foregoing the cost of training employees and managers on how to spot the signs of human trafficking and sexual exploitation and the appropriate

steps to take to eliminate such activity.

c.  Failing to refuse room rentals, or report guests to law enforcement, to
    maximize the number of rooms occupied and the corresponding rates, even
    if the rooms were rented to sex traffickers or buyers; and

d.  Reducing security costs by foregoing proper security measures, including,
    but not limited to, employing qualified security officers to actively combat
    human trafficking and sexual exploitation.

111.   As a direct and proximate result of the Defendants' egregious practices, Doe and victims of
sex trafficking and exploitation like her, have been permanently injured and damaged physically,
emotionally, psychologically, and financially.

## **CAUSES OF ACTION**

### **COUNT ONE:  18 U.S.C. § 1595 Trafficking Victims Protection Reauthorization Act of 2008**
### **(Against all Defendants)**

112.   Plaintiff Doe incorporates each foregoing allegation.

113.   Doe is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is therefore
entitled to bring a civil action under 18 U.S.C. § 1595.

114.   The Defendants' acts, omissions, and commissions, taken separately and/or together,
engage in violations of the TVPRA, including violations of 18 U.S.C. § 1591(a). At all relevant times,
through their acts, omissions, and commissions the Defendants breached this duty by knowingly
benefiting from a venture it knew or should have known sex trafficked Doe using force, fraud and
coercion.

115.   The Defendants have financially benefited because of these acts, omissions, and/or
commissions by keeping rooms open, keeping operating costs low, and maintaining the loyalty of the
segment of their customer base that seeks to participate in the sex trade. Moreover, the Defendants

directly benefitted from the trafficking of Doe on each occasion they received payment for rooms that she was being kept in at the Defendants' hotels. The actions, omissions, and/or commissions alleged in this pleading were the but for and proximate cause of Doe's injuries and damages.

116.   Doe has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the Defendants' hotels and properties.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff respectfully requests that this Court grant the following relief: compensatory damages, punitive damages, attorneys' fees and costs, and such other legal and equitable relief as this Court deems just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: July 25, 2025                    Respectfully submitted,

/s *Hillary Nappi*
_____
Hillary M. Nappi
HACH ROSE SCHIRRIPA & CHEVERIE LLP
112 Madison Avenue, 10th Floor
New York, New York 10016
Telephone: (212) 213-8311
Facsimile: (212) 779-0028
hnappi@hrsclaw.com

Krisel McSweeney
*(pro hac vice to be applied for)*
**McSweeney Law Firm**
5550 Glades Rd., Suite 500
Boca Raton, FL 33431
Tel.: 800-540-0668
Kmcsweeney@mcsweeneylawfirm.com